DECISION AND JUDGMENT ENTRY
{¶ 1} On March 9, 2000, appellees, Betty McLaughlin[1]
and James McLaughlin (husband and wife), filed claims asserting negligence and loss of consortium against appellant, Firelands Community Hospital ("Firelands") following Mrs. McLaughlin's fall and injury while she was a patient at Firelands. After a jury trial, a verdict was rendered in favor of Firelands by a vote of six to two. Appellees timely filed a motion for a new trial pursuant to Civ.R. 59, arguing, inter alia, that the verdict was against the manifest weight of the evidence. The trial court found the motion well-taken, and Firelands now appeals, asserting a sole assignment of error:
 {¶ 2} "The trial court abused its discretion in granting appellee/cross-appellants' [sic] motion for new trial on the basis that the jury verdict was against the manifest weight of the evidence where there was ample evidence to support the verdict."
 {¶ 3} Appellees have filed a cross-appeal, raising one cross-assignment of error:
 {¶ 4} "The trial court erred by not granting a new trial on alternative bases."
 {¶ 5} A new trial may be granted only once on the ground that the verdict was against the manifest weight of the evidence. Civ.R. 59(A)(6). The decision to grant a motion for a new trial pursuant to Civ.R. 59 rests in the sound discretion of the trial court, Sharp v. Norfolk W. Ry. Co. (1995), 72 Ohio St.3d 307,312, and such decisions are not reversible unless an abuse of discretion occurred. Green v. Castronova (1966),9 Ohio App.2d 156, 158. The trial court may review the sufficiency of the evidence to ensure against a miscarriage of justice. Osler v.City of Lorain (1986), 28 Ohio St.3d 345, 351.
 {¶ 6} "Where the trial court's decision on the motion for a new trial involves questions of fact * * * our task as a reviewing court is to `view the evidence favorably to the trial court's action rather than to the jury's verdict.'" Id., citingJenkins v. Kreiger (1981), 67 Ohio St.2d 314, 320. See, also,Malone v. Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440,448, ("This deference to a trial court's grant of a new trial stems in part from the recognition that the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the `surrounding circumstances and atmosphere of the trial.'"), citing Rohde v. Farmer (1970), 23 Ohio St.2d 82,94. Where the trial court articulates a reasonable basis for granting the motion, no abuse of discretion will be found. Oslerv. City of Lorain, 28 Ohio St.3d at 351. Appellate courts do not weigh the evidence upon review. Boston v. Sealmaster Industries,Inc., 6th Dist. No. E-03-40, 2004-Ohio-4278, ¶ 22. However, we have also held that a "trial court abuses its discretion in granting a motion for a new trial after a jury verdict where substantial evidence supports its verdict." Jones v. Booker
(1996), 114 Ohio App.3d 67, 69, citing Verbon v. Pennese
(1982), 7 Ohio App.3d 182, 184. A trial court also abuses its discretion when the motion is granted on the ground that one party failed to properly present evidence. Id., citing Tanton v.Zubkowicz (1972), 43 Ohio App.2d 1, 2.
 {¶ 7} Appellant frames its claimed error in the decision to grant a new trial in two parts: First, whether the jury had sufficient evidence to conclude that Firelands' nurses upheld the appropriate standard of care for Mrs. McLaughlin, and second, whether the trial court relied upon incorrect facts in granting a new trial.
 {¶ 8} Although the parties dispute many facts, the substance of the matter stems from a fall suffered by Mrs. McLaughlin while she was a patient at Firelands. Mrs. McLaughlin had, for some time, suffered from Parkinson's disease, scoliosis, osteoarthritis, and osteoporosis, and severe depression. Because of her depression, she refused to eat, lost a considerable amount of weight, and experienced severe dizziness and fatigue. Because she was not responding to "standard" medications, her psychiatrist, Dr. Carlos Lowell, recommended electroconvulsive therapy ("ECT"); Mrs. McLaughlin consented and was admitted to Firelands for ECT therapy.
 {¶ 9} Upon her admission to Firelands, due to her medical conditions, Mrs. Laughlin was assessed as "high risk" for falling. In addition, indicated side effects of ECT include headaches, memory difficulties, confusion, and hallucinations. Dr. Lowell, with extensive experience rendering ECT treatments, testified that that although ECT would most likely help Mrs. McLaughlin with her depression, it would predictably render her confused for some period of time.
 {¶ 10} It was not unexpected, therefore, for Mrs. McLaughlin to have experienced the confusion she did on August 5, 1999: A vest restraint was ordered as she was combative with the staff and hallucinating. Patients in vest restraints are closely monitored; for part of that day, Mrs. McLaughlin was kept in a "Geri chair" by the nurses' station. That night she did not sleep and continued to hallucinate. Her confused state — entirely predictable according to Dr. Lowell — continued until her scheduled ECT treatment the morning of August 6, 1999. The vest restraint was still in place as she was taken to her treatment that morning. After that treatment, Dr. Lowell transferred her to the special care unit of the psychiatric ward; he also increased her dosage of Desyrel, a sleeping medication, and added Haldol, an anti-psychotic drug.
 {¶ 11} The special care unit contained six beds, with two nurses assigned exclusively to monitor the six patients. The nurses were to check all patients in the unit at a minimum of every 15 minutes. If, in their judgment, a patient required closer monitoring, it could be provided; treating physicians were also able to order closer monitoring or supervision of the patients. Dr. Lowell testified that, despite Mrs. McLaughlin's state of the previous day and night, and due to the increased medications and the amount of supervision in the special care unit, he did not find it necessary to post a nurse for one-on-one supervision.
 {¶ 12} After her arrival on the unit, Mrs. McLaughlin slept through much of the morning; later that afternoon, however, her confusion returned. Mr. McLaughlin discussed his concerns about her confusion with the nurses, and notified them that she was still hallucinating. When the nursing staff assisted her with getting ready for bed, Mrs. McLaughlin was unable to recognize her bed. She fell asleep shortly before 11:00 p.m.; notes indicate that she slept soundly until a last check was charted at 3:00 a.m. the morning of August 7.
 {¶ 13} Meanwhile, around midnight that same evening, a man diagnosed with paranoid schizophrenia was admitted to the emergency room at Firelands. He was highly agitated and continuously yelling and screaming. He was initially placed in "soft" restraints, but had to be further restrained after he nearly escaped and his combativeness increased. At 3:15 a.m., an emergency room nurse called the special care unit of the psychiatric ward to advise them that the disruptive patient was to be transferred there; the nurse relayed her observations of the man, including the fact that he was yelling and agitated.
 {¶ 14} A special care unit nurse checked on all patients in the unit shortly before the man arrived; no notation of this check was made in Mrs. McLaughlin's chart, but the nurse testified that all the patients, including Mrs. McLaughlin, were asleep. The man was brought into the special care unit at 3:40 a.m. All witnesses testified that the man was continually yelling and screaming. Witnesses only differed in what, precisely, the man was screaming — something akin to "You're going to kill me."
 {¶ 15} Three nurses were on duty in the special care unit that night. Two emergency room personnel accompanied the man onto the unit. The man was brought to a room across from Mrs. McLaughlin's room; the doorways of the rooms were roughly 15 feet apart. The man was brought in four-point restraints, which required four people to transfer the patient into his bed. Another nurse stood by and made chart notations, totaling five people assisting with the yelling man in his room. The transfer was completed at approximately 3:45 a.m.; after the man was securely in bed, the two emergency room personnel left the unit. The special care nurses did not ask the emergency room personnel to remain to assist, although testimony indicated they could have requested this; the man was still in a highly agitated state, continuing to yell and scream in his room.
 {¶ 16} At the time Mrs. McLaughlin fell from bed, two of the three special unit nurses were in the disturbed man's room, attempting to quiet him; the third nurse was unsure of her whereabouts, but guessed that she was moving between the nurses' station in the center of the unit and the disturbed man's room. At approximately 3:50 a.m., a nurse in the man's room heard a "thud-like noise" from Mrs. McLaughlin's room across the way. From where she was standing at the foot of the man's bed, she had a view of the foot of Mrs. McLaughlin's bed through her room's door; however, her attention was directed towards the screaming man and not toward Mrs. McLaughlin. Apparently, despite the side rails on the bed and the call light within her reach, Mrs. McLaughlin crawled to the end of her bed and fell onto the floor. No one had checked on Mrs. McLaughlin since the man was brought into the unit, although they were required to do so every 15 minutes.
 {¶ 17} Upon review of the trial transcript and the exhibits, we cannot conclude that the trial judge, confronted with these facts, abused his discretion when granting the motion for a new trial. The nurses were clearly aware of their duty toward Mrs. McLaughlin — she was in a highly confused state, was at high-risk for falling, and had hallucinated for the past several days. The trial judge acted with sound discretion when deciding that, contrary to appellant's arguments, additional acts should have and could have been taken to prevent Mrs. McLaughlin's fall, despite the distraction of the raving man across the hall. Indeed, the unit was forewarned of the man's state and arrival, such arrivals were "routine," and it was reasonable to expect Mrs. McLaughlin to be highly susceptible to becoming agitated and highly confused, if not delirious, by mayhem and a man screaming of killing. Appellant's first assignment of error is therefore not well-taken. As the judgment is affirmed, we find appellees' cross-assignment of error moot and decline to address whether the motion should have been granted on alternate grounds.
 {¶ 18} The judgment of the Erie County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal are awarded to Erie County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Singer, P.J., Skow, J., Parish, J., concur.
[1] Although Betty McLaughlin filed the original claim in this matter, she passed away during the pendency of this appeal. By motion, James McLaughlin was substituted as a party in his capacity as executor of her estate pursuant to App.R. 29.